IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| LARRY D. DAVIES and<br>RUTH ANN DAVIES,<br><br>        Plaintiffs,<br><br>vs.<br><br>MIKE JOHANES and UNITED STATES<br>DEPARTMENT OF AGRICULTURE,<br><br>        Defendants. | Case No. 05-6009-CV-W-ODS |

<u>ORDER AND OPINION SETTING ASIDE FINAL DECISION OF THE UNITED STATES
DEPARTMENT OF AGRICULTURE AND REMANDING FOR RECONSIDERATION</u>

> "When I use a word," Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean—neither more nor less." "The question is," said Alice, "whether you can make words mean so many different things."
>
> – Lewis Carroll, <u>Alice's Adventures in Wonderland</u>, Ch. 6 (1865)

## I. BACKGROUND

This dispute arises from a backdrop of Congressional efforts to maintain the economic viability of farming in this country. "During the early 1980s, a serious financial depression, combined with several natural disasters, led to widespread farm foreclosures in the United States." <u>Pauly v. United States Dep't of Agriculture</u>, 348 F.3d 1143, 1146 (9th Cir. 2003) (per curiam). The declining worth of farms left the Farmers Home Administration ("FmHA") with a portfolio of undersecured and delinquent loans. <u>Id</u>. Congress responded by passing the Agricultural Credit Act of 1987 ("the Act"), which "allowed farmers and ranchers who were delinquent in payments on various agricultural loans to restructure their debts. The Act provided for write-down of secured debt to reflect the market value of the land securing the loan. In exchange for the write-down,"

the Act required the USDA to enter a Shared Appreciation Agreement with the borrowers. Stahl v. United States Dep't of Agriculture, 327 F.3d 697, 699 (8th Cir. 2003). "Shared appreciation agreements . . . shall provide for recapture [of the amount written down] based on the difference between the appraised values of the real security property at the time of restructuring and at the time of recapture." 7 U.S.C. § 2001(e)(2).

Plaintiffs own and operate a farm in Carroll and Livingston Counties, Missouri. The farm consists of four separate parcels totaling 510 acres. Like many farmers, Plaintiffs obtained loans from FmHA and its successor, the Farm Services Agency.[1] In 1992 Plaintiffs restructured their loans as permitted by the Act. Plaintiffs obtained a write down of approximately $179,700, bringing their debt to approximately $199,470. As required by the Act, Plaintiffs and FmHA entered a Shared Appreciation Agreement ("SAA") that required Plaintiffs to pay a percentage of any appreciation that occurred between the beginning and end of the agreement, with "[t]he amount of recapture [to] be based on the difference between the value of the security at the time of disposal or cessation by Borrower of farming and the value of the security at the time this Agreement is entered into." The SAA established the property's market value to be $331,200. The SAA did not establish a method for determining the property's value, but a method was established in regulations promulgated by FmHA. The regulation at the time the parties entered the SAA provided two different definitions for value. "Agricultural value" is the amount a typical purchaser would be justified in paying for the property "for customary agricultural uses . . . with the expectation of receiving typical net earnings from the farm." 7 C.F.R. § 1809.2(a) (1992). This subsection continues by clarifying that the most important factor in calculating agricultural value is the farm's income potential. Id. § 1809.2(a)(1); see also § 1809.3(d). "Market value" is the amount a typical purchaser would be justified in paying "considering agricultural and nonagricultural

---

[1] In 1994, Congress formed the FSA by combining the duties of FmHA and the Agricultural Stabilization and Conservation Service.

assets the property may have." Id. § 1809.2(b).  Market value (as that term was defined) was used only in connection with certain types of loans as specified in that same subsection; Plaintiffs' loans were not one of the type specified so the appraisal of their property in 1992 was governed by section 1809.2(a).

The regulation provided further guidance for appraising farm property, establishing a self-described "three way approach to market value" that considered "market data of prices of comparable properties, capitalization, and summation of all resources and facilities." Id. § 1809.4.[2]  "The appraiser will consider the results of these three approaches and make needed adjustments to these findings before reaching the final conclusion for the Recommended Market Value." Id. § 1809.4(d).  The appraiser is required to calculate the market value using each of the three methods, then "re-examine the calculations and the adequacy of the data analyzed in each approach.  The appraiser should give further consideration to the strong points and the weakness of each approach used.  As a general rule the value indicated by the market data approach is the most reliable indicator of value." Id.  Despite this section's suggestion of a preference or presumption in favor of the market data approach, the regulation elsewhere lists "[s]ome of the more important principles and factors affecting value that should be considered in making farm appraisals," including the farm's earning power. Id. § 1809.3.  The appraisals for each of Plaintiffs' four parcels reflect that all three approaches were evaluated and considered.  R. at 553-55 (Parcel 1); 574-76 (Parcel 2); 612-14 (Parcel 3); 646-48 (Parcel 4).[3]  With respect to each parcel, the three appraisal methods suggested virtually identical values so there was no need to reconcile them.

The regulatory landscape changed between the time Plaintiffs entered the SAA and the time they were obliged to pay the recaptured appreciation.  Section 1809 of the

---

[2]To enhance comprehension, the reader is advised that (1) the market data approach involves examination of sales of comparable properties, (2) the capitalization approach evaluates the income stream from farm operations, and (3) the summation approach is also referred to as "the cost approach."

[3]"R. at ___" is a reference to the Case Record for NAD Case No 2002E001002.

3

regulations was removed in 1993 and section 1951.914 was eventually[4] adopted in final form in 1998 to specifically address policies related to shared appreciation agreements. As originally promulgated, however, the regulation did not contain a method for performing the appraisals. See Suspension of Collection of Recapture Amount for Borrowers With Certain Shared Appreciation Agreements, 64 Fed. Reg. 19,863, 19,865 (Apr. 23, 1999). This changed in 2000 when section 1951.914 was amended to "clarif[y] . . the reference to 'current appraisal' by referring to § 761.7. The latter section, in part, sets out the requirements for real estate proposals." Farm Loan Programs Account Servicing Policies – Servicing Shared Appreciation Agreements, 65 Fed. Reg. 50401, 50404 (Aug. 18, 2000). The regulation's relevant provision stated – both at the time of the 2000 amendment and the time Plaintiffs' obligation to pay the recaptured appreciation matured – as follows:

> The value of the real estate security at the time of maturity of the Shared Appreciation agreement (current market value) shall be the appraised value of the security at the highest and best use less the increase in the value of the security resulting from capital improvements added during the term of the Shared Appreciation Agreement (contributory value) as set out herein. The current market value of the real estate shall be determined based on a current appraisal in accordance with 7 CFR § 761.7 . . . .

7 C.F.R. § 1951.914(c)(1). Section 761.7 contains requirements for procuring and conducting appraisals including, *inter alia*, adherence to Uniform Standards of Professional Appraisal Practice ("USPAP").

In 2002, Defendants' appraiser determined the highest and best use for Plaintiffs' land was agricultural. With the exception of the first parcel (which primarily consisted of Plaintiffs' house), separate values were derived using the comparable sales, income, and summation methods. R. at 49-51 (Parcel 2); R. at 115–17 (Parcel 3); 174-76 (Parcel 4). While this appears inconsistent with the dictates of section 1951.914(c)(1), there is no

---

[4]There were other regulatory provisions in existence between 1993 and 1998, but they are not relevant to this case.

indication any use was made of the income and summation analyses.[5]  In fact, as will be discussed later in this Order, there are strong reasons to believe that no use was made of these calculations.  Moreover, the Court observes a difference in the manner in which the income method was applied.  In 1992, the appraisals' discussions of the income method focused on the income that could be derived from the crops grown on the property; that is, the income from farm operations.  In 2002, the appraisals' discussions of the income method focus on the property's rental value.[6]

Plaintiffs commissioned an appraisal and submitted it to FSA for consideration.  It was rejected for a variety of reasons, including its use of "Agricultural Value" for appraising the property.  In this regard, FSA's Review Appraiser wrote that the

> "Agricultural Value definition was copied from a 1-1-93 edition of 7 CFR 1809.2(a), which would not have been available at the time the Shared Appreciation Agreement was entered into on May 29, 1992,[7] nor is this definition applicable at the time of the SAA maturity on May 29, 2002.  The Shared Appreciation Agreement dated May 29, 1992 . . . specifically states "Market Value."  The definition for "Market Value" can be found on page 219 of 2002 USPAP and is outlined on page 3, lines 113-126 of 2002 USPAP.  Current Federal Regulations concerning appraisals are contained in 7 CFR 761.7 and reference the market value definitions contained in

---

[5] The FSA Handbook for State and County Offices requires real estate appraisals to include valuations using these three approaches, but does not indicate what should be done with them.  R. at 337.  On this matter (as with regard to many others), the appraiser is to follow USPAP.

[6] The capitalization approach in the 1991 appraisals identifies the crops grown on the parcel, the yield per acre, and the price the farmer could expect for the crops grown. E.g., R. at 575.  In contrast, the capitalization approach in the 2002 appraisals identifies the types of property that make up the parcel and the acreage and "price per unit" for each type of property.  The latter analysis does not identify the crops grown, cannot be understood as calculating income based on farm operations, and can only be understood as establishing the income stream from renting the property.  E.g., R. at 50.

[7] As noted earlier, the same definition of "Agricultural Value" appears in the Code of Federal Regulations effective January 1, 1992, and was therefore applicable on May 29, 1992.

5

> USPAP. . . . [T]he "Agricultural Value" definition itself does not comply with USPAP, as it does not precisely define the compensation, but merely references the term "pay."

R. at 312(b).

Plaintiffs followed the appeal process, which eventually led to a hearing before the National Appeals Division ("NAD") on May 23, 2002. During the hearing, FSA's representatives consistently took the position that the correct methodology for appraising the property was utilized because the current regulations were followed. Tr. at 810, 827-29.[8] While they seemed uncertain about the reason for examining the 1991 appraisals (because, as they put it, the value of the property had been established and could not be reconsidered), Tr. at 827-28, 872-73, 896, FSA's representatives insisted there was no difference between the methodologies used because both measured "market value" and both treated the property as agricultural. Tr. at 829-30. The appraiser hired by Plaintiffs also testified about the differences between (1) an appraisal based on "agricultural value" as that term was defined in the 1992 regulations and (2) an appraisal of market value of property with a highest and best use of agricultural purposes. Tr, at 840-41, 846-52. The Hearing Officer upheld the agency's decision, concluding that (1) the current procedures were properly followed and (2) the 1992 appraisals and the 2002 appraisals considered essentially the same variables because both considered the value of the property assuming a competitive open market that brought together a willing buyer and a willing seller and assumed the property would be used for agricultural purposes. R. at 404-05. Plaintiffs requested review by the NAD Director, who upheld the Hearing Officer's decision. R. at 725-28. As this represents the agency's final decision, Plaintiffs' filed suit.[9]

---

[8]"Tr. at ___" is a reference to the transcript of the May 23, 2002, hearing.

[9]Plaintiffs' suit actually challenges three different agency decisions: (1) the decision regarding the method for appraising property, (2) the denial of Plaintiffs' request for financing to amortize the repayment obligation, and (3) the denial of Plaintiffs' request for Homestead Protection, which would have allowed them to lease the property from

6

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

Through most of these proceedings, the parties agreed the Court had jurisdiction to review the FSA decisions pursuant to the Administrative Procedure Act ("the APA"). However, in the very last document filed, Defendants assert the Court lacks jurisdiction. Subject matter jurisdiction cannot be waived, and the Court has an independent obligation to insure it exists.

Defendants' jurisdictional argument rests on language appearing in Plaintiffs' opposition to Defendants' Motion for Summary Judgment, wherein Plaintiffs suggested Defendants' changing of the method for conducting appraisals constitutes a breach of contract. Defendants contend this means the case is governed by The Tucker Act and it therefore must be presented to the Court of Claims. The Court disagrees because Plaintiffs' brief discussion of contract principles did not transform what had always been, in both fact and understanding, a challenge to an administrative agency's final decision. Plaintiffs' case has always been premised on Defendants' failure to abide by the regulations existing when the contract was formed. Plaintiffs' arguments about contract principles was presented for the limited purpose of countering Defendants' argument that it was not obliged to follow the regulations existing when the contract was formed. While contract principles may inform the Court's decision under the traditional standards for administrative review, the case is not thereby transformed into a claim for breach of contract that must be presented to the Court of Claims.

The APA empowers the Court to "hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is not a case

---

FSA with an option to purchase. The Court's decision on the first issue makes it unnecessary to consider the second two (which is why there has been no discussion about their factual predicates).

involving the wisdom or meaning of a statute or regulation; in other words, the agency is not alleged to have misinterpreted its regulations or the governing statutes, misapplied the current regulation or acted improperly in adopting it.  Cf. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375-76 (1989) (factual disputes, particularly those involving agency expertise, are to be reviewed for arbitrariness and capriciousness).  Instead, Plaintiffs challenge the legality of the agency's decision to rely upon the regulation that exists now instead of the regulation that existed when the SAA was executed.  "The Administrative Procedure Act requires federal courts to set aside federal agency action that is 'not in accordance with law,' 5 U.S.C. § 706(2)(A)--which means, of course, any law, and not merely those laws that the agency itself is charged with administering."  Federal Communications Comm'n v. NextWave Personal Communications Inc., 537 U.S. 293, 300 (2003).  However, the Court's decision would be the same even if the "arbitrary and capricious" standard applies, so for the sake of completeness the Court shall set forth that standard as well.  "Whether an agency's action is arbitrary and capricious depends on whether 'the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  Mausolf v. Babbitt, 125 F.3d 661, 669 (8th Cir. 1997) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

### B.  Analysis of the Parties' Dispute

The parties' dispute essentially presents two questions: (1) was the FSA obligated to follow the 1992 regulations instead of the 2002 regulations and (2) if the answer to the first question is "yes," did the FSA's appraisals comply with the 1992 regulations?  The Court answers the first question in the affirmative and the second question in the negative.

## *1. Was the FSA obligated to follow the 1992 regulations instead of the 2002 regulations?*

The affirmative answer to the first question seems rather obvious for a variety of reasons. The Government cannot, legally or constitutionally, unilaterally alter the terms of contracts it has entered. Similarly, the Government cannot retroactively apply amended regulations to alter the terms or construction of contracts it has already entered; to hold otherwise would permit the Government to accomplish by regulation what it could not otherwise accomplish. "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Stahl, 327 F.3d at 701 (quotation omitted). While the SAA may not be construed in a manner that is contrary to the statute authorizing their existence, id., the method of appraising property has not been prescribed by Congress.

Regardless of whether one views the matter as governed by the Due Process Clause, the Takings Clause, or simple contract principles, the point is rather clear and is not seriously contested by Defendants. In addition, it would be arbitrary and capricious to utilize one formula in 1992 and a different one in 2002. The "object" of the measurement is a change in value, see 7 U.S.C. § 2001(e)(2); the only way to accurately measure that change is to use the same formula "before" and "after." Using different formulas does not insure that the same value is being measured, and results in an improper comparison.

Defendants do not seriously defend their power to change the governing regulations – and, derivatively, the SAA's terms – to Plaintiffs' detriment. At most, they insist that the 1992 regulation generally, and Plaintiffs' appraisal specifically, do not abide by USPAP. Of course, that was no problem for the Government back in 1992, and to place any value on this argument would permit the Government to alter contractual terms retroactively.

For these reasons, the Court concludes FSA was obligated to appraise Plaintiffs' property in accordance with the 1992 regulations.

9

### *2. Did the FSA's appraisals comply with the 1992 regulations?*

Defendants contend the two regulations consider (or, at least in this case, actually considered) the same factors. The Court disagrees.

Plaintiff equates the 1992 regulation's concept of "agricultural value" with the 2002 regulation's concept of "highest and best use" because the highest and best use in 2002 was determined to be agricultural. This position suffers from the legal fallacy known as equivocation on terms: the phrase "agricultural value" has different meanings and implications in the two contexts. The phrase was defined in the 1992 regulation as the value someone expecting to receive farm income would pay for the property. Surrounding regulations emphasized (as do many other regulations governing farm loans) the importance of the income stream from farming activity in appraising the value of farm property.[10] While three distinct measures of value were called for, and while comparable sales would generally provide the best measure, the three values were to be harmonized in some manner so the final valuation was to be based on whichever method was most accurate under the circumstances.[11]

In contrast, a valuation of property where agriculture represents the highest and best use incorporates different considerations. As emphasized by Defendants throughout these proceedings, an appraisal cannot be conducted under the 1992 regulations and still comply with the 2002 regulations. This automatically demonstrates the two approaches are different, and this conclusion is buttressed by further detailed examination. The 2002 regulation calls for consideration of market data only. Other valuation methods were prepared, but the regulation does not describe any use for them.

---

[10]The focus on the income stream often derives from Congress' desire to insure the economic viability of farming. Measuring value in terms of the income from farming activity insures the borrower's ability to service the debt.

[11]The 1992 regulation did not explain, and the Court does not know, how the three methods should be harmonized in a case where differences in the valuations existed. This does not alter the Court's conclusion that this is what the regulation plainly required.

10

Moreover, in determining the income value from the property, the 2002 appraisals did not consider the *operating* income from the farm (apparently, because to do so would violate the regulation's requirement to follow USPAP). Consequently, one of the "basic" valuation principles espoused in the 1992 regulation was not considered in 2002.

Defendants also seem to contend that if the highest and best use for property is agricultural, then the market data approach reflects what a person would pay for the income generated by the property. This is not necessarily the case. For instance, as explained by Plaintiffs' appraiser, the use of comparable sales may be skewed if the highest and best use for surrounding property has changed from agricultural to something else. The change in value of the surrounding property affects what a willing purchaser will pay a willing seller, but will not affect the income from farm operations. In such a case, relying on comparable sales will result in a figure very different from the amount a person would pay simply for the farm-based income stream. This is merely one example, but the point remains: What someone will pay for agricultural property is not determined exclusively by the income stream one would expect if the property remained a family farm. This is why the 1992 regulation (1) emphasized the importance of the income stream from farm operations and (2) required harmonizing the figures derived from the three-way approach. The 2002 regulation does neither, effectively subjecting Plaintiffs to a valuation method different from the one used at the beginning of the SAA's term.

The agency must use the same valuation method at the end of the SAA that was used at the beginning. While the words used to describe the valuation methods used at the beginning and the end are similar, they have different meanings and are applied in different ways. Consequently, the agency acted in violation of law and arbitrarily and capriciously in failing to follow the 1992 regulations.

## III. CONCLUSION

In understanding the scope of the Court's decision, it is helpful to consider what the Court is *not* deciding. The Court expresses no opinion on the relative merits of either the 1992 regulation or the 2002 regulation; all the Court is deciding is that (1) the two methods are different and (2) the appraisal method used at the beginning of the contract term must be used at the end. The Court is also not deciding the correctness of any appraisal contained in the record; for purposes of this case, the Court has presumed that the appraisals accurately and properly employed the appraisal methods they purported to employ. Finally, the Court expresses no opinion regarding the proper method for accounting for capital improvements on the property (another issue raised by Plaintiffs but not discussed herein) because this will necessarily be reconsidered as a result of the Court's order.

The agency's final decision is set aside, and the agency is instructed to reconsider the matter in light of the Court's Order.

IT IS SO ORDERED.

DATE: December 5, 2005

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT